# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| Marie Ann Hurd, | ) | C.A. No. 4675-MA |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| Leonard Hurd, Jr., Individually and as Trustee of | ) | |
| The Marie Ann Hurd Trust, | ) | |
| Defendant | ) | |

## MASTER'S REPORT

Date Submitted: June 10, 2016
Draft Report:
Final Report: September 20, 2016

Introduction:

At issue is a trust that was established to provide income for the health, education, support or maintenance of the settlor's wife following the settlor's death in 2000. At the same time, irrevocable lifetime trusts were established for the benefit of the settlor's son from a previous marriage. According to the terms of the settlor's revocable trust agreement, upon his wife's death, the principal of her trust will be distributed to the lifetime trusts.

The settlor's son is the trustee of his stepmother's trust. In 2009, the stepmother filed this complaint against the trustee, alleging several breaches of fiduciary duty. She is seeking damages, an accounting of the trust, and the removal of her stepson as trustee. After a review of the trial record and post-trial

briefing, I recommend that the Court (a) enjoin the trustee from committing further breaches of trust;[1] (b) order the trustee to return assets he removed from the Trust on March 7, 2007,[2] and to trace the Trust's property, including the Delmarva Power shares, and recover the cash and securities or the proceeds therefrom, including any interest;[3] (c) appoint a receiver to administer the Trust;[4] (d) order the trustee to provide an accounting;[5] (e) suspend the trustee;[6] (f) award attorney's fees and costs to the beneficiary of the Trust;[7] and (g) order the immediate release of all Trust income in escrow to the beneficiary of the Trust.

Factual Background:

On March 21, 1997, Leonard Hurd, Sr. ("Mr. Hurd") executed a revocable trust agreement in his capacities as settlor and trustee.[8] The revocable trust agreement established the Leonard Hurd 1997 Management Trust ("Management Trust") for the benefit of the settlor, who was then living in Texas with his wife, Plaintiff Marie Ann Hurd ("Mrs. Hurd").[9] Under the terms of the revocable trust agreement, the laws of the State of Texas control any trusts created by this

---

[1] *See* Tex. Pr. Code Ann. § 114.008(a)(2).
[2] *Id.* at § 114.008(a)(3).
[3] *Id.* at § 114.008(a)(9).
[4] *Id.* at § 114.008(a)(5).
[5] *Id.* at § 114.008(a)(4).
[6] *Id.* at § 114.008(a)(6).
[7] *Id.* at §§ 114.0064, 113.151.
[8] Ex. 4.
[9] Trial Transcript ("TT") 19-20.

agreement.[10]  The revocable trust agreement provided for the distribution of the

Management Trust upon Mr. Hurd's death as follows:

> 3.3  Gift to Marie Ann Hurd Trust.  If Marie Ann Hurd survives me, the trustees shall distribute the following to the trustees to be placed in a separate trust Known as the Marie Ann Hurd Trust and administered as provided in Paragraph 4.1:  (i) settlor's Terry 35' Fifth Wheel Trailer or any travel trailer purchased to replace it, including furnishings, (ii) settlor's Dodge pick-up or any tow vehicle purchased to replace it, (iii) settlor's condominium located at No. 7 Rockford Road, D-15, Wilmington, Delaware, (iv) settlor's Delmarva Power common stock, and (v) an amount equal to the excess, if any, of  Five Hundred Thousand Dollars ($500,000.00) over the value, determined as of the date of settlor's death, of the other property passing under this Paragraph 3.3.
>
> 3.4  Residue.  All the remaining portion of the unappointed trust estate of the Management Trust, included any lapsed gift ("settlor's residuary trust estate"), shall be distributed as follows:
>
> > (A)  Gift to Exempt and Nonexempt Lifetime Trusts.  If any descendant of settlor survives settlor, the trustees shall distribute settlor's residuary trust estate to the trustees to be divided in a per stirpes manner among settlor's descendants who survive settlor with the generation-skipping portion of each descendant's share to be placed into a separate trust known by the name of that descendant and the words "Exempt Lifetime Trust" and the balance of that descendant's share to be placed into a separate trust known by the name of that descendant and the words "Nonexempt Lifetime Trust," with both trusts to be administered as provided in Paragraph 4.2.[11]

Soon after executing his revocable trust agreement, Mr. Hurd and his wife

returned to Wilmington, Delaware in order to be closer to hospitals and their

respective families.[12]  Mr. Hurd died on April 18, 2000.  His wife, who was born

---

[10] Ex. 4, Management Trust, at ¶ 6.13.
[11] *Id.* at ¶¶ 3.3, 3.4(A).
[12] TT 32-33.

on December 31, 1934, survived him.[13]  Under the terms of the Management Trust,

Mr. Hurd's son – Defendant Leonard Hurd, Jr. ("Leonard") - became the sole

trustee of the Marie Ann Hurd Trust (hereinafter "the Trust").[14]

Under Paragraph 4.1(A) of the Management Trust, the trustee of the Trust:

shall pay to the [sic] Marie all of the net income of the trust in convenient installments, at least quarterly and preferably monthly.  The trustees shall also pay to the [sic] Marie any amounts out of the principal of the trust (if income is insufficient) as, in the sole reasonable discretion of the trustees, are necessary or advisable for the [sic] Marie's health, education, support, or maintenance.[15]

The Management Trust also provides that upon Mrs. Hurd's death:

any undistributed income in the [T]rust shall be paid to the personal representative of the [sic] Marie's estate, and the principal of the [T]rust, if any, shall pass as provided in Paragraph 3.4, applied as if the Marie [sic] had predeceased settlor and settlor had then died disposing of the property under this agreement with the generation-skipping portion of the trust estate passing as the generation-skipping portion of settlor's residuary trust estate and the balance of the trust estate passing as the balance of that settlor's residuary trust estate.[16]

According to Leonard's July 31, 2001 "Accounting Summary and

Distributions Report for the Period of April 19, 2000 to June 30, 2001,"[17] the Trust

was funded with $500,000 plus $2,448.08 in income earned during the accounting

period for a total of $502,448.08.  The Accounting Summary listed the following

---

[13] TT 10.
[14] Ex. 4, Management Trust, at ¶ 5.1.  I use first names here to avoid confusion and repetition, and mean no disrespect by this practice.
[15] *Id.* at ¶ 4.1(A).
[16] *Id.* at ¶ 4.1(C).

date of death values of property owned by the settlor, which purportedly was transferred to the Trust: (1) $27,321 for a mobile home and $4,000 for a travel trailer; (2) $7,500 for the Dodge truck; (3) $62,000 for the Wilmington condominium; and (4) $74,169.43 for 4231 shares of Connectiv ("CIV")[18] common stock. A cash account containing $19,337.08 was also transferred to the Trust, according to this document.[19] Also transferred were the following securities and their respective values: (a) 3250 shares of Telefonos de Mexico ("TMX") ($185,148.44); (b) 2400 shares of Lone Star Steakhouse and Saloon, Inc. ("STAR") ($23,623.20); (c) 1126 shares of Bergen Brunswick Corporation (later Amerisourcbergen Corporation ("ABC")) ($5,981.88); (d) 653 shares of Computer Associates (later CA Inc. ("CA")) ($29,117.66); and (e) 2100 shares of Nucor Corporation ("NUE") ($96,928.13). The total value of the securities, including the Connectiv shares, was $414,968.72 as of April 18, 2000. The mobile home, travel

---

[17] Ex. 10.

[18] This and other abbreviations throughout my report represent the New York Stock Exchange symbols for the stocks owned or attributed to the Trust.

[19] During the trial that took place on February 8, 2016, Thomas Spychalski, a certified public accountant, testified that he was unable to trace the initial cash transfer of $19,337.08 in the books and records of the Trust that had been made available to him. TT 74-79. He traced an initial cash deposit of $400 in the Trust's checking account on June 6, 2001, followed on August 2nd by another cash deposit of $7,035.06. Ex. 9, Attachment 1-1 & 1-3. The latter deposit purportedly included $3,554.50, described on a document prepared by Leonard as a one-quarter distribution from the previous year "to all Heirs equally." Why Mrs. Hurd's share of this distribution was deposited in the Trust checking account and not given to

trailer, and truck were sold for less than their appraised values and the net sale proceeds were included in the invested securities, according to Leonard's Accounting Summary.[20]

Mrs. Hurd has lived in the condominium at 7 Rockford Road since 2000.[21] Early in his tenure as trustee, Leonard used Trust funds to replace a bathroom sink in the condominium.[22] Leonard also has used Trust income to pay the fees and property taxes on the condominium since 2000.[23] Mrs. Hurd received income distributions from the Trust on a quarterly basis for several years. Following 2007, however, the income distributions ceased.[24] Mrs. Hurd receives Social Security benefits in the amount of $1,000 each month.[25] She owns no other property, although she previously had owned a 1997 Buick that she had to give up because, without income from the Trust, she could no longer afford to pay for repairs and

---

her outright and free from trust, as appears to have occurred to the shares of Leonard and his two sons, was not addressed during the trial.

[20] Ex. 10. Spychalski testified that there were no receipts for the sale of the mobile home, trailer and truck to confirm the accuracy of the numbers in the Accounting Summary. TT 80. Spychalski also did not trace the amounts on the quarterly distribution reports because he did not have all the supporting documentation for the purported expenses of the Trust. TT 108, 119.

[21] TT 21.

[22] TT 15.

[23] TT 126-129.

[24] TT 11. After this litigation commenced in 2009, Leonard informed his stepmother that he was holding any further income distributions in escrow.

[25] TT 13-14.

motor vehicle insurance.[26]   In 2008, Mrs. Hurd sent a letter to the trustee requesting $702.97 to reimburse her for the cost of a new refrigerator she had purchased after the old refrigerator in the condominium stopped working properly.[27]   Leonard refused her request because she had not sought his approval prior to making the purchase.[28]

In 2009, Mrs. Hurd retained a lawyer and a certified public accountant in an effort to audit the transactions of the Trust.[29]   On March 31, 2009, Leonard responded to the accountant's written request for documents with a one-page letter in which he charged Mrs. Hurd $707 for reviewing her accountant's three-page letter and replying to it, plus stationary and postage.[30]   In his letter, Mr. Hurd also demanded a deposit in the amount of $5,250 before he proceeded any further in assisting Mrs. Hurd's accountant.   As stated in his letter, Leonard charged an hourly rate of $350, in one-hour increments, for his time and effort as trustee of the Trust.[31]   Shortly thereafter, Mrs. Hurd's attorney warned Leonard that he was obstructing the beneficiary's right to an audit of the Trust.[32]   Leonard responded

---

[26] TT 14, 22-23.
[27] Ex.5.  TT 16.
[28] TT16, 41.
[29] Ex. 6.
[30] *Id.*
[31] *Id.*
[32] Ex. 7.

that if it became necessary for him to seek legal advice, the cost would be part of the audit cost and payable by Mrs. Hurd.[33]

Procedural Background:

On June 17, 2009, Mrs. Hurd filed a complaint in this Court alleging that Leonard, in his capacity as trustee, had failed to abide by the letter and spirit of the Trust and had engaged in numerous breaches of trust, including: (a) charging excessive fees, (b) withdrawing assets from the Trust, (c) delaying income payments and necessary distributions to the beneficiary, (d) failing to account or provide information to the beneficiary regarding Trust property and income, and (e) making decisions regarding Trust property and income when he had a conflicting self-interest.[34] On July 31, 2009, Leonard filed an answer generally denying any breach of trust.[35] On February 9, 2010, Mrs. Hurd filed a Motion to Compel Answers to Discovery,[36] which I granted on March 31, 2010.[37] A few months later, Mrs. Hurd's counsel withdrew and she obtained new counsel.[38] Thereafter, the pace of litigation slowed. Although the parties appeared to be discussing settlement, on March 22, 2013, Leonard moved to dismiss the case for

---

[33] *Id.*
[34] Docket Item ("DI") 1.
[35] DI 13.
[36] DI 21.
[37] DI 23.
[38] DI 27.

lack of prosecution.[39] The motion was denied following oral argument on May 24, 2013.[40]

Despite the entry of a scheduling order on July 11, 2013,[41] it took nearly three more years to bring this case to trial on February 8, 2016. During the trial, only three witnesses testified, i.e., the two parties and a certified public accountant who testified to his inability to perform a formal accounting of the Trust's activities because of lack of documents.[42] Following the end of the trial, the parties submitted their post-trial briefs.[43]

Issues:

Mrs. Hurd argues that Leonard committed a breach of trust when he failed to provide her first accountant with free access to the books and records of the Trust. Even after litigation began and the Court compelled Leonard to deliver the books and records of the Trust, the documents he produced were still incomplete and Mrs. Hurd's second accountant was unable to complete a final report of his investigation into the Trust's activities. Mrs. Hurd also argues that Leonard's refusal to reimburse her for the purchase of a new refrigerator out of Trust principal was unreasonable and constitutes a breach of trust. Mrs. Hurd contends

---

[39] DI 33.
[40] DI 36.
[41] DI 38.
[42] TT 76.
[43] DI 65-66, 70, 73.

that Leonard's hourly rate of $350 was not based upon any customary or usual compensation for a trustee's management of a trust, but was arbitrarily selected and, therefore, constitutes a breach of trust. Finally, Mrs. Hurd accuses Leonard of misappropriating assets from the Trust when he removed $65,640 in cash and 6,075 shares of Nucor Corporation common stock from the Trust's investment account on March 7, 2007.

Leonard contends that he never denied Mrs. Hurd access to the books and records of the Trust, and that he ultimately provided these documents to her attorney. The only dispute arose when Leonard sought reasonable compensation for his time in assisting with the requested audit, which is allowed under the terms of the Management Trust. Leonard argues that, as an accountant by trade, he always used his best judgment in administering the Trust and never harmed Mrs. Hurd or elevated his own interests over her interests as a beneficiary of the Trust. According to Leonard, he refused to reimburse his stepmother for the refrigerator because he did not believe it was a necessary expense under the terms of the Trust. Leonard claims that he misinterpreted Paragraph 3.3 when he initially funded the Trust, which resulted in a windfall to the beneficiary. Leonard argues that, under the correct interpretation of the language of Paragraph 3.3, the Trust should only have been funded with the items listed in subsections (i) through (iv) of Paragraph 3.3. As a result, he denies having improperly transferred any assets out of the

Trust. Finally, Leonard argues that if the Court ultimately decides to remove him as trustee then, under the terms of the Management Trust, his two sons must be appointed as successor trustees of the Trust.

Analysis:

Paragraph 3.3 of the Management Trust provides for the Trust to be funded with:

(i) settlor's Terry 35' Fifth Wheel Trailer or any travel trailer purchased to replace it, including furnishings, (ii) settlor's Dodge pick-up or any tow vehicle purchased to replace it, (iii), settlor's condominium located at 7 Rockford Road, D-15, Wilmington, Delaware, (iv) settlor's Delmarva Power common stock, and (v) an amount equal to the excess, if any, of Five Hundred Thousand Dollars ($500,000.00) over the value determined as of the date of settlor's death of the other property passing under this Paragraph 3.3.

Leonard argues that, given the total value of the first four items of property listed above – which he gives as $147,669.43 – then the only plausible interpretation of subsection (v) is that the settlor intended to fund the Trust with the total value of these four items regardless of whether they totaled more than $500,000, but if they totaled less than $500,000, then the Trust would be funded with the lower amount only. However, Leonard's interpretation of this provision would render subsection (v) completely superfluous. There would have been no reason for the settlor to have included subsection (v) in Paragraph 3.3 of the Management Trust if he had

intended the Trust to be funded only with the first four gifts, regardless of their values.

Read in its entirety, Paragraph 3.3 is clear and unambiguous. If the total value (as of the date of settlor's death) of the first four gifts of property equals less than $500,000, then additional property is to be gifted to the Trust to make up the difference in value. If the total value of the first four gifts equals or exceeds $500,000, then no additional property is to be gifted to the Trust. Leonard's interpretation of Paragraph 3.3 of the Trust is unreasonable and ignores the import of the word "and" following subsection (iv). Paragraph 3.3 provides for the initial funding of the Trust with no less than $500,000 worth of property.

Leonard's "July 31, 2001 Accounting Summary" gives the appearance that he interpreted Paragraph 3.3 in the above manner because this document states that the Trust was funded with $500,000 per "the Management Trust."[44] However, Leonard admitted at trial that he never transferred the 4231 shares of Delmarva Power common stock into the Trust.[45] These shares remained in the brokerage account in which his father had placed them.[46] Even though Leonard appears to have attributed the dividend income from 4231 shares of Delmarva Power (which by then had been acquired by Connectiv, Inc. ("CIV")) to the Trust, he

---

[44] Ex. 10.

[45] TT 37.

[46] *Id.*

intentionally underfunded the Trust by $74,169.72, and misled the beneficiary into believing that the Trust owned these shares, in breach of his fiduciary duty to act in good faith.[47]

Connectiv subsequently merged with Potomac Electric Power Company, part of Pepco Holdings, Inc. ("POM") and, in place of the 4231 shares of CIV, Leonard apparently received 5424 shares of POM with a cost basis of $70,994.[48] In his March 8, 2003 distribution memo to his stepmother, Leonard noted that in the fourth quarter of 2002, he had adjusted CIV dividends "for portion of the Potomac shares returned to the Administrative Trust to pay past allocations to 'corpus' of expenses for travels to Texas to sell assets and administration expenses, while accounted for, were not paid until this quarter …."[49] According to this memo, a balance of 2031.5 shares of Potomac remained after the "adjustment." However, there is no evidence that any of these 2031.5 shares were ever transferred to the Trust. Furthermore, by reducing the number of shares he was attributing to the Trust, Leonard significantly reduced the amount of dividend income Mrs. Hurd would have otherwise received from the Trust.[50]

---

[47] *See Ames v. Ames*, 757 S.W.2d 468, 476 (Tex. App. 1988), *affirmed and modified*, 776 S.W.2d 154 (Tex. 1989).

[48] These figures are taken from Leonard's worksheet. Ex. 11. TT 82-90.

[49] Ex. 12.

[50] According to the distribution memo, in the first three quarters of 2002, the Trust received $930.82 in CIV dividends each quarter. In the fourth quarter of 2002, the Trust received only $844.65 as a dividend from CIV. Ex. 12. According to

Mrs. Hurd had anticipated receiving around $1,000 in Trust income per month, based on what her husband had told her.[51] In 2002, she apparently received $4,550.59 after expenses from the Trust.[52] At trial, Mrs. Hurd testified that she used the additional income for food and clothing.[53] In 2003, Mrs. Hurd's distribution was adjusted downward again for a portion of the Potomac shares "returned to the Administrative Trust to pay allocations of 'corpus' portion of Administrative expense allocaqtion [sic]."[54] As a result, Mrs. Hurd's net income from the Trust that year decreased to $3,288.55. A similar adjustment was noted again in 2004, resulting in Mrs. Hurd receiving only $2,593.17 after expenses in 2004.[55]

In November 2004, the Trust's Nucor holdings increased from 2100 shares to 4200 shares as a result of a two-for-one stock split.[56] By the spring of 2006, the Trust's investment account contained approximately $715,000 in securities.[57] Leonard transferred 2400 shares of Lone Star Steakhouse, 6,500 shares of Telefonos de Mexico, 563 shares of CA, Inc, 832 shares of AmerisourceBergen

---

Leonard's worksheet, the 5424 shares of POM generated a quarterly dividend of $2255.09, of which $844.65 was attributed to the shares "retained" by the Trust. Ex. 11.

[51] TT 12.

[52] Ex. 12

[53] TT 15.

[54] Ex. 12.

[55] *Id.*

[56] Ex. 13.

Corporation, and 4,200 shares of Nucor from an investment account at Brown Co. to an investment account at E*TRADE Securities, LLC.[58] Shortly after this transfer, there was another stock split. The Trust now held 8,400 shares of Nucor, which were valued at $459,144 on December 31, 2006.[59] On December 15, 2006, Lone Star Steakhouse and Saloon, Inc. merged into another company and the Trust received $65,640 in cash for its 2400 shares.[60]

The E*TRADE statement from March 2007 shows that on February 28, 2007, the Trust's entire investment account was valued at $833,027.31.[61] In a letter dated March 6, 2007, Leonard informed his stepmother that he was making an adjustment of the Trust's assets "to the maximum value of $500,000 per Trust document."[62] According to this letter, the Trust now held only the following assets: (a) Wilmington condominium valued at $100,000 based on a recent sale of a one bedroom unit in the condominium complex; (b) $11,266 in cash; (c) 563 shares of CA, Inc. valued at $14,694; (d) 832 shares of AmerisourceBergen Corporation valued at $43,763; (e) 2325 shares of Nucor Corporation valued at $141,523; and (f) 6500 shares of Telefonos de Mexico valued at $188,760. All together, the assets held by the Trust were worth $500,008. On March 7, 2007,

---

[57] Ex. 14.
[58] *Id.*
[59] Ex. 16.
[60] *Id.*
[61] Ex. 15.

Leonard transferred $65,640 in cash and 6,075 shares of Nucor Corporation out of the Trust's E*TRADE investment account into an account that he owned.[63] Leonard testified that he reduced the assets of the Trust because he felt that "it was getting out of bounds of what was intended originally." [64]

On March 31, 2007, the Trust's investment account was worth $437,081.07.[65] By the end of that year, the Trust's investment account was worth $441.982.08.[66] And on December 31, 2008, it was worth only $295,305.92.[67]

There is no provision in the Management Trust authorizing the trustee to cap the value of the Trust at a maximum of $500,000 or to remove trust assets while the Trust's beneficiary is still alive.[68] Had this been the intent of the settlor, there would have been language in the trust instrument directing the trustee to transfer any Trust principal in excess of $500,000 to another trust or to a beneficiary outright and free from trust.[69] Leonard breached his fiduciary duty to Mrs. Hurd when he removed $65,640, representing the value of the cashed-out Lone Star

---

[62] *Id.*

[63] *Id.* TT 51. Since the 6,075 shares of Nucor were removed from the Trust on March 7, 2007 through November 10, 2014, they have generated a total of $77,152.50 in dividends. Ex. 9. TT 96-97.

[64] TT 125.

[65] Ex. 15.

[66] Ex. 16.

[67] *Id.*

[68] *See In re Ellison Grandchildren Trust*, 261 S.W.3d 111, 117 (Tex. App. 2008). Although Leonard is the residuary beneficiary under the Management Trust, the principal of Mrs. Hurd's trust does not pass to him until after Mrs. Hurd's death.

Steakhouse shares, and 6,075 shares of Nucor from the Trust's investment account. By transferring those assets to himself, Leonard engaged in self-dealing, violating the duty he owed to his stepmother of "good faith, fair dealing, loyalty and fidelity over affairs of trust and its corpus."[70] Leonard also deprived Mrs. Hurd, at a minimum, of the dividend income that was subsequently generated by the 6,075 shares of Nucor. Similarly, Leonard breached his fiduciary duty by failing to transfer the settlor's shares of Delmarva Power into the Trust when it was first established, and thereafter by his "adjustments" as Leonard reduced the dividend income generated by POM to zero.[71] Under the terms of Paragraph 3.3 of the Management Trust, the Trust should have been funded initially with the settlor's Delmarva Power common stock. Had this been done, Mrs. Hurd would have received the dividends (less Trust expenses) generated by 5424 shares of POM. Instead, Leonard received most of this income. Mrs. Hurd testified that when all

[69] TT 119-120.
[70] *Ames*, 757 S.W.2d at 476 .
[71] The last distribution memo in the record covers the Trust for the period ending on December 30, 2004. Ex. 12. In the fourth quarter of 2004, the "CIV" dividend was $170, and the total dividend income generated by "CIV" for 2004 was $933.50, according to this distribution memo. In Leonard's March 6, 2007 letter to Mrs. Hurd, there is no reference to the Trust owning any shares of Connectiv, Delmarva Power, or Potomac. Ex. 15.

the Delmarva stock was gone, she called Leonard and asked him where it went.[72]

Leonard replied that it did not matter since it was "all going to be his anyway."[73]

Leonard charged the Trust's beneficiary $350 per hour, in one-hour increments, for his services. At trial, Leonard described his fee as being "in the ballpark for an hourly rate" for professional services because it was the going rate for attorneys in Washington, D.C.[74] While attorneys may serve as fiduciaries, their typical role is that of an advocate. Moreover, Leonard is not an attorney; he is an accountant by profession with a B.S. degree in accounting from the University of Delaware and an M.B.A. degree from Wilmington College.[75] In addition, Leonard does not live in Washington, D.C.; he lives in Selbyville, Delaware. Nonetheless, Leonard charged Mrs. Hurd $350 for the time it took him to read the accountant's three-page letter,[76] and he expected to be paid that same amount even if all he did was open a door to let someone in to inspect the Trust books.[77] Not only was Leonard's fee completely unrelated to the "customary and usual compensation where … fiduciary services are performed," his demand for

---

[72] TT 17.

[73] TT 18.

[74] TT 67-68. Leonard selected his hourly rate after having had "a situation involving employment" with one of his sons, presumably in Washington, D.C..

[75] TT 53, 65-66. Leonard's professional background is somewhat sparse; he mentioned working as an accountant for Hercules for eight years, and at another company for six years. TT 54.

[76] Ex. 6.

[77] TT 49.

$5,250 as a deposit had the effect, presumably calculated, of discouraging Mrs. Hurd from obtaining the books and records needed by her accountant to audit the Trust's activities.[78]  As a result, I find that Leonard breached his fiduciary duty to the Trust's beneficiary by charging such an unreasonable rate for his services.

Leonard also breached his fiduciary duty to the Trust's beneficiary by refusing to reimburse Mrs. Hurd for the cost of a new refrigerator.  Paragraph 4.1(A) of the Management Trust provides for the trustee to pay "any amounts out of the principal of the trust (if income is insufficient) as, in the sole reasonable discretion of the trustee[], are necessary or advisable for [Mrs. Hurd's] health, education, support, or maintenance."[79]  The use of the words "support" and "maintenance" in a Texas trust instrument indicates the creation of a "support trust."[80]  As a trustee of a support trust, Leonard was obligated to make his decision whether:

> to authorize a distribution after considering the following indicia:  (a) the size of the trust estate, (2) the beneficiary's age, life expectancy, and condition of life, (3) his or her present and future needs, (4) the other resources available or the beneficiary's individual wealth, and (5) his present and future health, both mental and physical, to name a few.[81]

---

[78] Ex. 4.  Management Trust at ¶ 6.1
[79] *Id.* at 4.1(A).
[80] *Duncan v. O'Shea*, 2012 WL 3192774, at *5 (Tex. App. Aug. 7, 2012) (citing *State v. Rubion*, 308 S.W.2d 4, 8-10 (Tex. 1957)).  .
[81] *Id.* (citing *Keisling, v. Landrum*, 218 S.W.3d 737, 744 (Tex. App. 2007); *Estate of Dillard*, 98 S.W.3d 386, 395 (Tex. App. 2003)).

Leonard failed to consider any of the above indicia before refusing Mrs. Hurd's request for $702.97. He did not consider whether the replacement of a broken refrigerator was "necessary or advisable" for a 73 year-old woman who was living on $1000 per month. He denied her request solely on the basis that Mrs. Hurd had not consulted with him prior to purchasing the new refrigerator.[82] Nowhere in Paragraph 4.1 does it require a beneficiary to consult with or seek prior approval from the trustee before requesting disbursement of principal. Since Leonard failed to exercise any discretion, but instead acted capriciously in refusing the beneficiary's request, I find that Leonard breached his fiduciary duty on this occasion as well.

Conclusion:

For the reasons stated above, I conclude that Leonard has breached his fiduciary duty to the Trust's beneficiary. I recommend that the Court: (1) direct Leonard to provide a complete accounting of all activities of the Trust from April 18, 2000 to the present time, including the collection and disbursement of all Trust income and all amounts expended for expenses allegedly performed on behalf of the Trust and Trust property; (2) direct Leonard to provide access to all documents regarding Trust income and assets, including access to all financial, tax and other documents relating to the Trust; (3) permanently enjoin and restrain Leonard from

---

[82] TT 41.

converting or using Trust income or assets or taking any further actions regarding Trust property without first obtaining approval from the Court; (4) order Leonard to repay any amounts of Trust income or property wrongfully used or directed by him for his own benefit and/or the benefit of others affiliated with him, together with interest on all such amounts; (5) order Leonard to pay all costs associated with this litigation, including reasonable attorneys' fees; (6) suspend Leonard as trustee; (7) appoint a receiver to administer the Trust; and (8) order the immediate disbursement of all Trust income in escrow to the beneficiary.

Because several years have elapsed since this complaint was first filed, I am waiving a draft report and issuing my recommendations as my final report. I refer the parties to Court of Chancery Rule 144 for the process of taking exception to a Master's Final Report.

Respectfully,

/s/ Kim E. Ayvazian

Kim E. Ayvazian
Master in Chancery

KEA/kekz